IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TIMOTHY BUBB,

        Plaintiff,      OPINION AND ORDER

  v.

                 16-cv-270-slc
CAROLYN COLVIN,
Acting Commissioner of Social Security,

        Defendant.

Plaintiff Timothy Bubb seeks review of a final decision by defendant Carolyn W. Colvin,
Acting Commissioner of Social Security, denying his claim for child disability insurance benefits
and supplemental security income under the Social Security Act. 42 U.S.C. § 405(g). Bubb,
who was born February 15, 1994, applied for benefits at the age of 18, alleging that he had been
disabled since January 1, 2010 as a result of numerous impairments and conditions, including
asthma, left knee pain, depression, social anxiety disorder, oppositional defiant disorder and
traits of a personality disorder. After the local disability agency twice denied his claim, Bubb had
a hearing before an administrative law judge (ALJ). The ALJ issued his decision on November
6, 2014, finding that Bubb was not disabled at any time between his alleged onset date and the
time of the decision. Admin. Rec. (AR) 41-52. The Appeals Council denied Bubb's application
for review, making the ALJ's decision the final decision of the Commissioner.

In this appeal, Bubb argues that the ALJ erred by failing to properly weigh the opinion
of a consulting physician who examined him and by relying on flawed vocational expert (VE)
testimony. For the reasons explained below, I conclude that neither of these challenges is well-
founded. The ALJ issued a thorough decision that accounted for all the evidence of record and
gave sound reasons for accepting some evidence and rejecting other evidence. Accordingly, I am
affirming the Commissioner's decision.

The following facts are drawn from the Administrative Record (AR), filed with the Commissioner's answer in this case:

## FACTS

### I.  Medical History

Timothy Bubb was born February 15, 1994.  AR 43.  In 2002, Bubb was diagnosed with oppositional defiant disorder, anxiety disorder, possible ADHD and possible autism spectrum disorder.  AR 49, 481-82.  Although Bubb saw school counselors and treating providers as a child, he received very little mental health treatment during the alleged period of disability.  AR 49, 449.  Apart from an unsuccessful course of stimulant-based medication for ADHD symptoms as a child, Bubb did not take any medication or undergo therapy.  *Id.*

Following a rehabilitation evaluation conducted on December 22, 2011, Dr. Mark Ham diagnosed Bubb with social phobia, oppositional defiant disorder and possible ADHD and noted that although Bubb was socially isolated, he had an interest in developing relationships and had a girlfriend and two friends.  AR 482-86.  Dr. Ham evaluated Bubb again on January 31, 2012 and performed a variety of tests.  He found that Bubb had average intellectual functioning, significantly delayed arithmetic skills, interpersonal problems, social anxiety problems, significant problems shifting from one task to another and significant problems controlling his emotions. AR 475-78.

On February 27, 2013, plaintiff's treating physician, Dr. Brian Riddle, completed a "Medicaid Presumptive Disability" form on which he simply checked a box stating "[u]nable to work or return to normal functioning for at least 12 months."  AR 550-51.  Dr. Riddle's progress notes from the same date indicate that he completed the form at the request of Bubb's mother,

who told him that Bubb had a history of oppositional defiant disorder, questionable autism and ADHD. Dr. Riddle did not perform a mental status examination; he told Mrs. Bubb that he was referring Bubb to psychology "to try to have this issue cleared up" and that he would not sign another form unless Bubb was seen by psychology and formal diagnoses were made. AR 1768-69.

Bubb saw Dr. Adam Ries and Dr. Julianne Davis for a psychological evaluation and testing to help facilitate his SSDI application. In a report dated January 14, 2014, the physicians diagnosed Bubb with social anxiety disorder, Cluster B and C personality features and possible mild autism spectrum disorder. AR 1810-15. They noted their concern that Bubb "appears to have become quite comfortable in the position of having his mother advocate for him, and his mother appears quite focused in her determination to help [Bubb] get on SSDI." AR 1814. Because both of Bubb's parents were on SSDI, the physicians also were concerned that "a culture of idiosyncratic problem solving is being propagated, potentially undermining [Bubb's] independent functioning potential." *Id.* Drs. Ries and Davis recommended that Bubb work to overcome his anxiety and expand his comfort zone because he tended to limit his efforts and may be "underestimating his ability to navigate social situations." AR 1815.

## II. State Consulting Physicians

At the initial and reconsideration levels of review, consulting physicians for the local disability agency reviewed Bubb's application for benefits and medical records. On May 28, 2013, state agency psychological consultant Dr. Roger Rattan concluded that Bubb had moderate limitations in the categories of adaptation (workplace stress), social interaction, understanding and memory with respect to complex tasks and detailed instructions, and

concentration, persistence and pace.  However, Dr. Rattan determined that even with these limitations, Bubb could perform simple, repetitive tasks and meet the basic mental demands of unskilled work on a sustained basis.  AR 123-26.

After examining Bubb on September 21, 2012, Dr. Marlin Trulsen issued a report to the state Disability Determination Bureau, finding that Bubb demonstrated a moderate to occasional marked level of impairment in responding appropriately to brief and superficial contact with co-workers and supervisors.  AR 506-11.  Dr. Trulsen noted that Bubb appeared "generally capable of tolerating the stress and pressures typically found in an entry-level workplace especially when [he was] more familiar with setting and responsibilities and minimized contact with others."  AR 510.  He also wrote that Bubb was capable of respecting authority to an average level.  AR 511.

## III.  Administrative Proceedings

After the local disability agency denied Bubb's claim initially and upon reconsideration, Bubb had a video hearing on October 30, 2014 before Administrative Law Judge William Brown.  AR 41.  Bubb was represented by counsel at the hearing.  The ALJ heard testimony from Bubb, a medical expert and a vocation expert.  *Id.*

Bubb testified that he lives with his parents, has been home schooled (he has no degree or equivalency) and has never had a job.  AR 64-65.  He stated that he has multiple panic attacks every day that are triggered by crowds, loud noises, negativity and small spaces.  AR 65, 69.  Bubb is not taking medication or seeing a mental health provider because neither have been helpful in the past.  *Id.*  Bubb testified that during a typical day, he watches television, reads books, rides his bicycle and takes a walk.  He is able to cook and do some housework.  Bubb

4

stated that he does not have trouble getting along with people but that his social anxiety can cause problems with others. AR 66. Bubb has two friends who visit but otherwise is solitary. AR 67.

Dr. James Felling, a psychiatrist who reviewed Bubb's medical records, testified that Bubb had mild limitations in daily activities and moderate limitations in social functioning and concentration, persistence and pace. AR 70. When asked about Bubb's functional limitations, Dr. Felling testified that Bubb could perform simple, routine tasks with no more than very simple math, no responsible contact with the public and only brief and superficial contact with small numbers of people at a time. AR 71. Although he admitted on cross examination that having panic attacks is a common response for people with Bubb's impairments, he stated that none of the medical records document Bubb's alleged panic attacks. *Id.*


## IV. ALJ's Decision

The ALJ issued a decision denying Bubb's application on November 6, 2014. Applying the familiar five-step sequential evaluation process, the ALJ determined that although Bubb was severely impaired by asthma, left knee pain, depression, social anxiety disorder, a history of oppositional defiant disorder and personality disorder, Bubb had the residual functional capacity (RFC) to perform a limited range of medium work. Specifically, he found that Bubb was limited to "routine, repetitive instructions and tasks in unskilled work with brief, superficial and infrequent contact with co-workers;" no contact with the public; no more than minimal math; and working with no more than two to three co-workers at a time. AR 46. He noted that Bubb was able to tolerate ordinary supervision, handle the stress of a routine, repetitive work setting with no rapid pace or high production goals. *Id.* (The ALJ also included limitations related to

5

climbing, heights and environmental hazards; because Bubb has not raised any specific challenge to these additional limitations, it is unnecessary to recite them in detail.)

With one exception, the ALJ gave great weight to the opinions of Drs. Felling, Trulsen, Ries and Davis in making his RFC assessment: he did not adopt Dr. Trulsen's finding that Bubb had occasional marked limitations in social functioning, explaining that Bubb would have only moderate limitations in this area within the very restrictive limitations stated in the RFC.  AR 48. He also found that Dr. Trulsen's assignment of a global assessment of functioning (GAF) score of 55-60 supported only mild to moderate limitations.  AR 49.  The ALJ did not give any weight to the conclusory form completed by Dr. Riddle because it was based on second-hand reports of Bubb's psychological history rather than any current psychological diagnoses.  AR 50.  The ALJ also found that plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms were not fully credible given his lack of medical treatment, his failure to report them to his treating providers and his ability to perform a wide range of daily activities.  AR 47.

At the final stage of the evaluation process, the ALJ relied on the testimony of Edward Utities, a vocational expert, who testified that a person with Bubb's RFC would be able to work as a custodian, machine cleaner and officer cleaner.  AR 51.

## OPINION

### I.  Consulting Examiner's Opinion

Bubb asserts that the ALJ erred by not giving greater weight to the finding of Dr. Trulsen, the consultative examiner, who opined that Bubb had a "moderate to occasional marked" limitation in responding appropriately to "brief and superficial contact with co-workers and supervisors." Although the ALJ gave Dr. Trulsen's opinion great weight overall, he chose to adopt

a moderate social functioning limitation, which is on the lower end of Dr. Trulsen's recommended range and follows the recommendations of the medical expert and the reviewing physicians.

Although an administrative law judge must consider all medical opinions of record, he is not bound by those opinions. *Haynes v. Barnhart*, 416 F.3d 621, 630 (7th Cir. 2005). The weight given to a particular physician's opinion depends on the circumstances. *E.g., Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). "Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1). Because Dr. Trulsen was hired by the state agency as a consultative examiner and was not Bubb's treating physician, his opinion is not entitled to controlling weight. 20 C.F.R. §§ 404.1502, 416.902 (A nontreating source is "a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you."); *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009) (ALJ not required to assign controlling weight to nontreating source).

Instead, the ALJ must weigh the opinions of non-treating physicians in light of various factors listed in the regulation, including whether the physician supports his opinion with medical signs and laboratory findings, how consistent the physician's opinion is with the evidence as a whole and whether the physician is a specialist in the allegedly disabling condition. *Simila*, 573 F.3d at 514 (citations omitted); 20 C.F.R. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6) (listing factors to consider in weighing medical opinions). The ALJ also must provide reasons supported by substantial evidence in the record for the weight he gives any medical opinion. Soc. Sec. Rul. 96–6p; 20 C.F.R. §§ 404.1527(e), 416.927(e); *Walters v. Astrue*, 444 F. App'x 913, 917 (7th Cir. 2011). "[R]ejecting or discounting the opinion of the agency's own examining physician that the

claimant is disabled . . . can be expected to cause a reviewing court to take notice and await a good explanation." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014).

Bubb asserts that the ALJ erred in citing Bubb's GAF score as the sole reason for discounting Dr. Trulsen's finding of an occasional marked limitation. Contrary to Bubb's assertion, however, the ALJ provided well-supported reasons for his decision. He thoroughly reviewed the findings of all of the physicians who treated, examined or reviewed Bubb's medical record and found that Bubb would not have marked limitations in social functioning if he worked within the "very restrictive parameters" of "no public contact, contact with only 2 to 3 people at a time, and brief, superficial and infrequent contact with others." AR 48. The ALJ explained that the evidence showed that Bubb was "capable of functioning despite some level of difficulty interacting with others due to anxiety symptoms." *Id.* Although the ALJ cited Bubb's GAF score as *further* evidence of Bubb's ability, he did not rely on it as the sole basis for his decision. *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014) (ALJ may not ignore or discount evidence, including GAF scores); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (GAF score relevant measure of severity of symptoms and functional level but not determinative of disability).

The restrictive parameters that the ALJ set for Bubb are well-supported by the medical record. Even though Dr. Trulsen found that Bubb would have an occasional marked limitation in social functioning, he opined that Bubb appeared "generally capable of tolerating the stress and pressures typically found in an entry-level workplace especially when [he was] more familiar with setting and responsibilities and minimized contact with others." AR 510. Dr. Felling and Dr. Rattan agreed, finding that even with moderate social functioning limitations, Bubb could perform simple, routine tasks associated with unskilled work. Dr. Felling further testified that Bubb should be limited to work requiring no more than very simple math, no responsible contact

8

with the public and only brief and superficial contact with small numbers of people at a time. *See White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005) ("The ALJ's ultimate residual functional capacity finding tracked [testifying medical expert] Dr. Steiner's opinion almost exactly, and Dr. Steiner's opinion, buttressed by the State Consultants' opinions, was an adequate evidentiary foundation for the finding."). Notably, Dr. Ries and Dr. Davis–the physicians from whom Bubb sought a one-time consultative examination to support his application for benefits–questioned the severity of the symptoms reported by Bubb's mother and they did not state that Bubb was incapable of working.

Bubb does not rely on any findings from his treating physicians in arguing that he has a marked limitation in social functioning. This is unsurprising because there is very little evidence in the record from Dr. Hamm and Dr. Riddle. Although Dr. Hamm noted that social interactions were difficult for Bubb, he did not assess any work limitations for Bubb. Dr. Riddle completed a form in which he reported that Bubb was not able to work for 12 months, but the ALJ reasonably concluded that it was not entitled to any weight because Dr. Riddle completed the form at the request of Bubb's mother without examining Bubb. Dr. Riddle also drew a line in the sand: he referred Bubb to psychology and would not sign another form unless formal diagnoses were made.

The ALJ also provided a reasonable explanation for rejecting Bubb's subjective complaints of severe symptoms related to social anxiety (such as panic attacks), noting that Bubb had not reported or sought treatment for panic attacks, had obtained very little psychological treatment, had engaged in a wide range of daily activities and was able to maintain relationships with family, a girlfriend and two friends. AR 47. On appeal, Bubb did not challenge either the ALJ's rejection of Dr. Riddle's cursory opinion or his credibility assessment, and therefore, has waived any such

arguments.  *Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) (arguments that are not raised or developed are considered waived).

## II.  Vocational Expert Testimony

Bubb argues that the VE's testimony was flawed because it is clear that a person with the social interaction limitations in the hypothetical question could not work as a custodian, machine cleaner or office cleaner.  In support of his argument, Bubb cites *Dimmett v. Colvin*, 816 F.3d 486, 489-90 (7th Cir. 2016), in which the Court of Appeals for the Seventh Circuit faulted the ALJ for "uncritically accepting the vocational expert's testimony," which it found "fatally weak" in part because the VE ignored the contents of the Occupational Information Network (known as the "O*NET"), "the most current manual of job descriptions."  Specifically, the court of appeals found that a comparison of the claimant's limitations with tasks the cited jobs actually require "should have caused alarm bells to ring."  *Id.* at 489.  Most VEs who testify in social security cases–including Edward Utities in this case–rely on the Dictionary of Occupational Titles ("DOT") when identifying the type of jobs that a claimant can perform and how many of these jobs exist.  However, in recent years, the court of appeals has criticized the DOT as obsolete, and it has focused its scrutiny on how VEs reach their conclusions with respect to the types and numbers of jobs claimants can perform.  *Id.*; *Forsythe v. Colvin*, 813 F.3d 677, 680 (7th Cir. 2016) (no effort was made to explain what kind of work jobs involved or where VE obtained his suspiciously round numbers); *Herrmann v. Colvin*, 772 F.3d 1110, 1113 (7th Cir. 2014) (DOT is obsolete catalog of jobs dating to 1977 that contains no statistics on number of jobs in given category); *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014) (VEs do not in general indicate what data sources are or vouch for their accuracy; "many of them estimate the number of jobs of

a type the applicant for benefits can perform by the unacceptably crude method of dividing the number of jobs in some large category (which may be the only available data) by the number of job classifications in the category.")  VEs and their testimony have not fared well under this scrutiny.  *McKay v. Colvin*, 2016 WL 6432582, at *8 (N.D. Ill. Oct. 31, 2016).

In light of this recent case law, Bubb argues that the O*NET description for each of the three jobs identified by Utities raises questions as to whether a person with Bubb's social functioning limitations could perform these jobs.  However, the general O*NET descriptions for the jobs at issue do not cast doubt upon Bubb's ability to perform them.

Bubb points out that according to O*NET, the custodian job may require active listening and communicating with supervisors, peers or subordinates.  http://www.onetonline.org/link/summary/37-2011.00 (last visited December 27, 2016).  In addition, Bubb points out that under the heading "work context," 62% responded that they had daily face-to-face discussions with individuals or teams.  With respect to the machine cleaner and office cleaner jobs, O*NET mentions daily face-to-face discussions and knowledge of customer service.  *Id.* for job #51-9198.00 and 53-7061.00.  However, the O*NET does not specify the frequency, quality, or quantity of the social contact required in any of these positions or describe what a face-to-face discussion might involve.  The logical inference is that this would *not* involve the public, since none of the job tasks mention this, and the reference to "Customer and Personal Service" under the "knowledge' heading states that the employee must have "knowledge of principles and processes for providing customer and personal services . . . [including] customer needs assessment . . . and evaluation of customer satisfaction."  The RFC that the ALJ assessed for Bubb anticipates that he will have brief, superficial and infrequent contact with co-workers; tolerate ordinary supervision; and work with up to three people at one time.  Nothing in the O*NET listing

11

appears to contradict this RFC.   Certainly, the common understanding of these positions is that they involve solitary work without any public interaction.  *Cf. Dimmett*, 816 F.3d at 489 (The laundry and dry-cleaning attendant jobs mentioned by VE should have "caused alarm bells to ring in [ALJ's] ears given that he'd instructed the [VE] that the plaintiff is incapable of performing jobs that would expose him to temperature extremes, humidity, and airborne pollutants."). Accordingly, Bubb not persuaded this court that the ALJ relied on fatally weak or obviously flawed VE testimony when the ALJ made his step 5 determination.


## ORDER

IT IS ORDERED that the decision of the Commissioner of Social Security denying plaintiff Timothy Bubb's application for child disability insurance benefits and supplemental security income under the Social Security Act is AFFIRMED.  The clerk of court is directed to enter judgment for defendant and close this case.


Entered this 28th day of December, 2016.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge